SAMUEL P. APPLEGATE, Plaintiff, *v.* ANNA F. APPLEGATE, Defendant.

Supreme Court, Kings Special Term for Trials, March, 1922.

**Husband and wife — where parties after a ceremonial marriage void because the woman had a former husband living, continue to cohabit after the first husband's death, their union becomes legitimate — second husband cannot maintain action for annulment — common-law marriage — Laws of 1907, chap. 742.**

Where in an action to annul a marriage on the ground that at the time it was entered into defendant was married to another man, it appears that plaintiff had lived with and acknowledged the defendant as his wife for fourteen years after the death of her first husband in August, 1907, it will not be held that plaintiff

was never in fact defendant's husband because they entered into their relationship under an express contract which was void and because they have not since the death of the first husband consented to live together under any other arrangement.

In an action for divorce brought by the defendant herein against her first husband neither an interlocutory nor a final judgment was ever entered, but when the testimony was taken on June 3, 1903, the plaintiff herein was present. Four months later he and the defendant were married by a minister and lived together as husband and wife and were generally recognized as such up to April, 1921, when on account of domestic infelicities they separated. *Held,* that such continued recognition of the marital relationship of the parties had ripened into a status.

No public policy requires that the defendant be branded as one dishonored, and she will be granted judgment for the dismissal of the complaint, with costs.

While there was no legal marriage between the parties to the present action up to the time of the death of defendant's first husband, yet from January 1, 1908, by virtue of the statute (Laws of 1907, chap. 742) they were husband and wife by reason of a common-law marriage.

ACTION to annul a marriage.

*Charles G. Wheeler,* for plaintiff.

*Leonard McGee (John T. S. Wade,* of counsel), for defendant.

LAZANSKY, J. Action to annul a marriage. The defendant had been married to one Berg. In 1903 she commenced an action to recover a judgment of divorce against said Berg in the Supreme Court of Kings county. The defendant defaulted, and upon the proof submitted it was directed by the justice presiding that judgment be entered for the plaintiff in that action. Neither an interlocutory nor a final judgment was ever entered. The plaintiff in this action was present on June 3, 1903, the time of the taking of the testimony in the divorce suit. He employed the attorney for the plaintiff in that divorce action and helped pay him some of his fee. The proof indicates that both the plaintiff and the defendant in this action believed that they were free to marry three months after the taking of the testimony. It does not appear that either ever inquired or knew anything about an interlocutory judgment or a final judgment. Four months after the taking of the testimony the parties were married by a minister and lived together as husband and wife, and were generally recognized as such up to April, 1921, when on account of some differences the plaintiff left the defendant. Berg, to whom the defendant was first married, died in August, 1907, which plaintiff and defendant knew. Plaintiff learned after April, 1921, for the first time that the defendant had never procured a judgment of divorce against her husband. Plaintiff seeks to annul the marriage because defendant was married to another and undivorced at the time of her marriage to plaintiff. In *Matter of Wells,* 123 App. Div. 79; affd., 194 N. Y. 548, the court, at page 85, says: " It seems to me,

in view of the decisions and authorities which have been referred to, that the rule ought to be that where one person is free to enter into the matrimonial relation, and does so in good faith, but the other party is incapable of entering into such relation because of a former wife or husband living, or other impediment, when such impediment is removed, if the parties continue matrimonial cohabitation, continue to introduce and recognize each other as husband and wife, and are so recognized by their relatives, friends and by society, it ought to be held that from such moment they are actually husband and wife, and that under such circumstances it is of no importance that a formal agreement to live together as husband and wife was not entered into or that either did not know that the impediment to such an agreement had been removed, when in fact it had been so removed and both parties were competent to enter into the matrimonial state." Here after the death of the defendant's husband Berg, which was known to the plaintiff, the parties lived together and recognized each other as husband and wife and were so recognized by society. The same relationship existed between them as had existed from the moment of the ceremonial marriage between them. Of course they were not married up to the time of Berg's death. Another obstacle was in their way until January 1, 1908, when chapter 742 of the Laws of 1907, amending the Domestic Relations Law, went into effect as the result of which common-law marriages became effective. Such marriages were not recognized from 1901 until 1908. *Matter of Ziegler* v. *Cassidy's Sons,* 220 N. Y. 98. I would have no difficulty whatsoever in following the decision in *Matter of Wells, supra,* and hold that from January 1, 1908, this plaintiff and defendant were husband and wife by reason of a common-law marriage. Surely if out of certain facts where there is no express promise or other words of agreement an ordinary contract may be implied in fact, surely where parties have recognized each other in such a holy relationship the law should not be timid in holding that a contract of marriage was implied, despite the fact that they had originally entered into a ceremonial marriage which was void, but which they believed all the time they were living together was valid. While their marriage was invalid and they did not know of it, their actions from the time the impediments were removed were an expression of their intention to be that which they theretofore were not but which they believed they were. However, before one may follow the rule laid down in *Matter of Wells, supra,* he is confronted with what was said in *Smith* v. *Smith,* 194 App. Div. 543, 548: " The difficulty in holding that the union between the parties was valid as a common-law marriage arises from the fact that the element of intent and mutual

consent of the parties to adopt such a relationship is entirely wanting. The plaintiff and the defendant, so far as the evidence discloses, believed that they were wedded through a ceremonial marriage, and there was no mutual consent to the marriage relation, except by virtue thereof. The two essentials of a common-law marriage are capacity and mutual consent. At common law the marriage relation may be formed by words of present assent, *per verba de præsenti,* and without the interposition of a clergyman or person lawfully authorized to perform the marriage ceremony. To constitute a marriage *per verba de præsenti,* the parties must be in each other's presence when the agreement is made. The agreement, however, need not be in the presence of witnesses. It may be expressed by parol, or the parties may adopt whatever ceremony their choice or religious belief may suggest. The vital element is the agreement itself, in whatever form it is adopted, which constitutes the contract and creates the relation." Although the consent to marriage and the living together up to 1921 came out of a ceremony, in other words, out of an express agreement, these parties always intended to be husband and wife in ignorance of the impediment thereto and regardless of its removal. While it is true that their living together was on the basis of an express contract which was void and their relationship was intended to continue and their minds only met on that basis, it is nevertheless the fact that they always consented to live together as husband and wife. While that consent had no effect up to the time of the removal of the impediment, it seems to me that after its removal that consent ripened into an effective force. If it cannot be said that consent is implied in fact then it should be implied in law. See contrary view of Mr. Justice Holmes in dissenting opinion in *Travers* v. *Reinhardt,* 205 U. S. 423. The law will not be tardy to recognize and sustain a decent relationship. The extract from *Smith* v. *Smith, supra,* is only *obiter dictum.* The case was decided for the plaintiff upon a different basis. Without express authority therefor, I am unwilling to hold that this plaintiff, who has lived with and acknowledged the defendant as his wife for a period of fourteen years after the death of her first husband, was never in fact her husband, because the parties entered into their relationship under an express contract which was void, and have not since the death of the first husband consented to live together under any other arrangement. Fourteen years' recognition by themselves and by their friends and people generally of the marital relationship of these two parties has ripened it into a status. No public policy requires that this defendant be branded as one dishonored. If the logic of the argument in *Smith* v. *Smith, supra,*

be irresistible, then logic must give way to common sense and justice. It is urged that cases such as *Matter of Wells*, 123 App. Div. 79; *Matter of Biersack*, 96 Misc. Rep. 161; *Fenton* v. *Reed*, 4 Johns. 52; *Rose* v. *Clark*, 8 Paige, 574; *Clayton* v. *Wardell*, 4 N. Y. 230, are cases involving property rights, and that in matrimonial actions involving the status of the parties, the marriage must be proved by direct proof, as distinguished from proof of matrimonial cohabitation and acknowledgment of the status. Reference is made to *Collins* v. *Collins*, 80 N. Y. 1. In that case the court had under consideration the matter of an application for counsel fee and alimony *pendente lite*. On the question of the marriage of the alleged wife, it was urged that even if the invalidity of the divorce she attempted to obtain were conceded, her disability to marry ceased on the death of her first husband, and her subsequent matrimonial cohabitation with the defendant is equivalent to a marriage with him after the removal of her disability. The court at page 9 say: " This is a point of great importance, and presents many considerations. It has been held in several cases, in which property rights only were concerned, that the presumption of a subsequent marriage can be indulged in such a case. Where the union is in its origin meretricious, the weight of authority is to the effect that the same condition is presumed to continue, unless there is some evidence of a change, and the mere fact that the parties subsequently hold themselves out as married, is not sufficient for that purpose, but it has been held that where the connection was begun under a contract of marriage supposed to be legal, though in fact void, in consequence of a disability of one of the parties, yet after the removal of the disability a subsequent marriage may be presumed from acts of recognition by the parties of each other as husband and wife, and from continued matrimonial cohabitation and general reputation. (*Wilkinson* v. *Payne*, 4 T. R. 468; *Rose* v. *Clark*, 8 Paige, 574; *Clayton* v. *Wardell*, 4 N. Y. 230.) " The court then notes that these cases only involve rights of property, and that the doctrine has not been applied in this state to actions between husband and wife for a divorce. The court then states: " Although as a general rule, for ordinary purposes, actual marriage may be presumed from matrimonial cohabitation, and the acknowledgments of the parties that they are husband and wife, there are cases in which direct evidence of marriage is required. Not indeed of a marriage ceremony, but of the actual contract between parties competent to marry, to be husband and wife, where, as in this State, such a contract is not required to be accompanied by any formalities. The cases generally mentioned as calling for such direct proof, as contra-distinguished from mere proof of matri-

monial cohabitation, recognition and general reputation, are prosecutions for bigamy and actions for *crim. con.* But many others are mentioned in the authorities, and some of them lay down the proposition generally, that direct evidence is required in all criminal or *quasi* criminal prosecutions; or actions founded on the relation of marriage, and in others it is said that when the violation of the relation of husband and wife constitutes the guilt of the accused, such relation must be proved by direct evidence." Reference is made to 2 Bishop on Marriage and Divorce (4th ed. §§ 266–276), in which the learned author confesses himself unable to decide the question upon authority, but strongly intimates his own opinion that direct evidence should be given. The argument from this is that since this is a matrimonial action, a common-law marriage cannot be spelled out of the relationship of the parties after 1908, because there must be proof of an actual contract between the plaintiff and the defendant. In a later edition, entitled Bishop on Marriage, Divorce and Separation (vol. 1), the rule, as stated above, is said to exist because (§ 1034): " When, in any issue of marriage or no marriage, the presumed innocence of a proven cohabitation is overcome or essentially weakened by the counter presumption of the innocence of some other act or transaction appearing in the same case, as explained in the last sub-title, there must be further evidence of the marriage — in other words, a marriage in fact must be shown — or the proofs will be inadequate." And in section 1036 it is stated: " Where one man sues another for a criminal conversation with his wife, raising together the two issues of his marriage and the defendant's wrongful intercourse with her, the presumption of the innocence of the plaintiff's cohabitation is either wholly overcome or greatly weakened by the like presumed innocence of the defendant's intercourse with the same woman. Therefore the plaintiff must prove the fact of his marriage to the woman, because plainly it is not derivable, as against the counter presumption, simply from his or her mere presumed innocence." It would seem, therefore, that direct proof of a marriage is necessary where a direct attack is made upon the marriage by one of the parties who has been guilty of some unlawful or immoral act in connection with marital relationship. But surely that rule can have no application here. This defendant has not been guilty of any immoral or unlawful act in her life with the plaintiff since 1908. An interesting discussion of the kind of proof which is necessary to prove a marriage in bigamy, criminal conversation and divorce will be found in Wigmore on Evidence (vol. 3, §§ 2084, 2085). In referring to the case of *Morris* v. *Miller*, 4 Burr. 2057, in which Lord Mansfield wrote, the learned author says: " Yet in the law

of evidence, oddly enough, it has been his fate not to find this vindication. Rarely did he make any real contribution to its theory or its practice; not infrequently he helped to obscure it; and in several respects he created, in scorn of precedent, rules which merely encumbered the law of evidence with unnecessary and impolitic restrictions. One of these was the rule requiring *proof of 'a marriage in fact'* in *bigamy* and *criminal conversation."* The author also says: " The policy of Lord Mansfield's rule has received but scanty judicial exposition. (1) For the action of *criminal conversation,* it was placed by him on the ground, partly that the action was penal in its nature * * * partly that to receive habit and repute alone might enable a man having a mistress to recover damages from another man for the seduction of a woman whose relation to the plaintiff did not justify him in claiming any right to her chastity. So far as the first reason is concerned, it stands or falls with the general policy of establishing a special rule for criminal cases. So far as the second reason is concerned, it indeed is based on a real contingency; yet it is doubtful whether there is any need of exercising special vigilance in behalf of a defendant whose conceded conduct deprives him of honorable sympathy." The learned author also expresses a want of sympathy for the same rule which was applied in cases of bigamy. In section 2085 he says: " It remains to notice the state of the law to-day in respect to Lord Mansfield's rule: (*a*) In the civil action for *criminal conversation,* there is no doubt about the common law; it was plainly determined in *Morris* v. *Miller* and *Birt* v. *Barlow\** * * * and has ever since been accepted. The comparative infrequency of this action nowadays has allowed the rule to continue without dispute. (*b*) On a charge of *bigamy,* the English rule has in few jurisdictions been followed. But in the great majority it has been rejected, either by judicial ruling or by statutory change; so that in the latter jurisdictions habit and repute suffice, as on other issues. * * * (*c*) On a *prosecution for adultery or incest,* Lord Mansfield's rule would not be applicable. In a few jurisdictions it has been extended to those offenses; but this is not justified either by precedent or by policy, and has elsewhere been denied. (*d*) In *criminal cases in general* the rule as stated in terms by Lord Mansfield does not apply. Nevertheless, a few courts have seen fit to expand the rule to cover all criminal cases. (*e*) In suits for *divorce,* founded on *adultery,* Lord Mansfield's rule has of course no application; neverthless the rule has occasionally been applied in such a proceeding. Much less has it any proper place

---

* 1 Doug. 171.— [REP.

in divorce suits founded on other causes; and on this there has been general agreement." It seems to me, therefore, what is suggested in *Collins* v. *Collins, supra,* should not be applied here, and unless what was said in *Smith* v. *Smith, supra,* is controlling a common-law marriage may here be proved by acts and declarations of the parties and their general reputation. In 1 Bishop on Marriage, Divorce and Separation (§ 970) it is stated: "If the parties desire marriage, and do what they can to render their union matrimonial, yet one of them is under a disability,— as where there is a prior marriage undissolved,— their cohabitation, thus matrimonially meant, will in matter of law make them husband and wife from the moment when the disability is removed; and it is immaterial whether they knew of its existence, or its removal, or not, nor is this a question of evidence. This doctrine is overlooked in some of the cases, but it is abundantly sustained by others, and the reasoning on which it rests is conclusive. Here are the mutual present consent, to which not even written or spoken words are necessary, and consummation, which is useful in the proofs but is not necessary,— more, therefore, than the law requires." The doctrine is restated in section 975 as follows: "Though a cohabitation was introduced by a formal ceremony of marriage, and the parties erroneously supposed the impediment of a former marriage to have been taken away, and never had their mistake corrected, still, in localities where formal solemnization is not essential, valid marriage may be presumed to have occurred after the impediment was removed. To employ words more nicely accurate, and cover a larger ground, the living together of marriageable parties a single day as married, they meaning marriage, and the law requiring only mutual consent, makes them husband and wife; for here are all the elements of a contract of present matrimony. And in the nature of this proposition, it cannot be varied by their antecedent conduct, or by their knowledge or ignorance of law or fact." None of the cases cited by the learned author are actions in which the matrimonial relationship is the subject-matter of the litigation. Since, in my opinion, there should be no difference in the rule in cases involving property and in an action such as this, where the defendant is merely seeking to defend a charge of immoral or unlawful conduct, it seems to me that the rule stated is the one which should be followed in this case. Unfortunately, the short time at my disposal prevents a thorough research in order to determine whether there are cases in other jurisdictions where the matrimonial status is the direct subject-matter of the action. In *Eaton* v. *Eaton,* 66 Neb. 676, the situation was somewhat similar to the one in the case at bar. And the

court say, at page 683: " If the parties live together and intend to sustain toward each other the relation of husband and wife, they are, in the absence of any impediment fatal to that relationship, legally married. The marriage between the plaintiff and the defendant was an attempt made in good faith to form a legal union. Both intended to live in wedlock. In the absence of an impediment to the marriage, no ceremony would have been required; the mutual consent of the parties would have been sufficient. When the impediment was removed, why may not consent be inferred from continued cohabitation? " In *Chamberlain* v. *Chamberlain*, 68 N. J. Eq. 736, the same rule is stated. But there it appears that both husband and wife knew of the removal of the disability and thereafter expressed in words what might be construed to be an intention of continuing as husband and wife. In *North* v. *North*, 1 Barb. Ch. 241, Chancellor Walworth writes as follows: " And if the former husband was dead at the time of this subsequent cohabitation, the court may infer an agreement of these parties to live together as husband and wife after his death, so as to constitute a valid marriage between them at the time the present bill was filed. (*Rose* v. *Clark*, 8 Paige, 574; *Matter of Taylor*, 9 Paige, 611.) " In *Campbell* v. *Campbell*, commonly known as the *Breadalbane Case*, L. R. 1 S. & D. App. Cas. 182, Lord Westbury significantly says, at page 212: " There is no foundation for the argument that the matrimonial consent must of necessity be referred to the commencement of the cohabitation, nor any warrant for the Appellant's ingenious argument that, as the consent interchanged must be referred to some particular period, which he insists was at the commencement of the cohabitation, and therefor insufficient, the cohabitation, which continued afterwards without interruption, would warrant no other conclusion than that which would be warranted by the consent interchanged at a time when it was insufficient. I should undoubtedly oppose to that another, and, I think, a sounder rule and principle of law, namely, that you must infer the consent to have been given at the first moment when you find the parties able to enter into the contract. The conclusion, therefore, that I derive, and which unquestionably, is consistent with the language of the cases which have been referred to, is, that the consent between these parties was given, and that the marriage, therefore, in theory of law, took place, at the time when, by the death of the first husband, they became competent to enter into the contract." Whether this pronouncement be sound in principle or not, it is surely a just one, especially in a case such as the one at bar. In the *Breadalbane* case the original consortium was meretricious. Here it was commenced in good faith. For

cases in other jurisdictions on this subject see L. R. A., 1915-E, 91, and footnote. Although it appears that these parties lived together after the removal of the disabilities as husband and wife, upon the basis of their original ceremonial marriage, it seems to be that there can be no valid objection in holding that since they intended to be husband and wife after the removal of the disability they were such. If the marriage cannot be implied out of the facts, then it may be implied in law. I, therefore, direct judgment for the defendant dismissing the complaint, with costs.

Judgment for defendant.